UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

NANCY SCHWARZ, on behalf of herself individually as the mother of MICHAEL PARKER, deceased; and NANCY SCHWARZ, as the representative and administrator of MICHAEL PARKER'S ESTATE,

Plaintiffs,

v.

LASSEN COUNTY ex rel. the LASSEN COUNTY JAIL (DETENTION FACILITY), et al.,

Defendants.

No. 2:10-cv-03048-MCE-CMK

**MEMORANDUM AND ORDER**

Plaintiff Nancy Schwarz ("Plaintiff"), the mother of decedent Michael Parker ("Parker"), on behalf of herself and as successor-in-interest to Parker, seeks redress against Defendants Lassen County ("the County" or "Lassen"), Undersheriff John Mineau ("Mineau") (collectively, "Defendants"), and the City of Susanville, for injuries allegedly suffered by Plaintiff and Parker related to Parker's detainment at the Lassen County Adult Detention Facility and Parker's death at Renown Hospital in Reno, Nevada.

///

Plaintiffs' Fourth Amended Complaint alleges the following claims against the County and Mineau, pursuant to 42 U.S.C. § 1983: deliberate indifference to serious medical needs in violation of the Fourteenth Amendment;[1] deprivation of the basic necessities of life in violation of the Fourteenth Amendment; deprivation of life without due process in violation of the Fourteenth Amendment;[2] failure to provide medical care for serious medical condition in violation of the Fourteenth Amendment Amendment, and violation of the right of familial association under the First and Fourteenth Amendments.

Additionally, Plaintiff brings state law claims for negligent infliction of emotional distress and failure to discharge a mandatory duty pursuant to California Government Code § 815.6 against both the County and Mineau. Plaintiff also brings state law claims against the County for failure to summon medical care for an inmate pursuant to California Government Code § 845.6, and reckless or malicious neglect of a dependent adult pursuant to California Welfare and Institutions Code § 15657.

Presently before the Court is Lassen and Mineau's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.[3] (ECF No. 82.) For the reasons set forth below, the Motion for Summary Judgment is GRANTED.[4]

---

[1] Claims by pretrial detainees are analyzed under the Due Process Clause of the Fourteenth Amendment. Thompson v. Worch, 6 F. App'x 614, 616 n.1 (9th Cir. 2001) (citing Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir.1998)). However, the Eighth Amendment's deliberate indifference standard applies to Fourteenth Amendment claims that correction facility officials failed to address the medical needs of pretrial detainees. See, e.g., Lolli v. County of Orange, 351 F.3d 410, 418-19 (9th Cir. 2003.) In short, "the Fourteenth Amendment due process rights of pretrial detainees are analogized to those of prisoners under the Eighth Amendment." Cabrales v. County of Los Angeles, 864 F.2d 1454, 1461 (9th Cir. 1988), vacated on other grounds, 490 U.S. 1087 (1989), opinion reinstated, 886 F.2d 235 (9th Cir.1989).

[2] Plaintiff brings this claim as a Fourteenth Amendment Due Process claim. However, the clear thrust of Plaintiff's claim for deprivation of life without due process is that Defendants were deliberately indifferent to Parker's serious medical need. Such a claim falls squarely within the Cruel and Unusual Punishments Clause of the Eighth Amendment. See Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) ("The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement.") (citing Farmer v. Brennan, 511 U.S. 825, 832, 811 (1994)). Accordingly, the standards of the Eighth Amendment govern this claim.

[3] All further references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure unless otherwise noted.

[4] Because oral argument will not be of material assistance, the Court orders this matter submitted on the briefs. E.D. Cal. Local R. 230(g).

## PROCEDURAL HISTORY

On February 13, 2013, Defendants Lassen County and John Mineau moved for summary judgment. (ECF No. 82.) Plaintiff filed an opposition to the motion April 1, 2013 (ECF No. 107), accompanied by a Statement of Undisputed and Disputed Facts (ECF No. 108). The County filed a reply on April 15, 2013. (ECF No. 115.) Subsequently, on April 17, 2013, Lassen County filed a Motion to Strike portions of Plaintiff's Statement of Undisputed and Disputed Facts. (ECF No. 117.) On May 10, 2013, Plaintiff filed a Response to the Motion to Strike. (ECF No. 124.)

Then, on July 9, 2013, the Court issued the following minute order:

> Plaintiff failed to authenticate the exhibits to Plaintiff's Opposition to Defendant Lassen County's Motion for Summary Judgment (ECF No. 108). In ruling on a motion for summary judgment, the Court cannot consider documents which do not have a proper foundation laid to authenticate them. See Canada v. Blain's Helicopters, Inc., 831 F.2d 920, 925 (9th Cir. 1987). Plaintiff has five (5) days from the date of this minute order to submit to the Court documents which lay a proper foundation to authenticate the exhibits to Plaintiff's Opposition. The Court will not consider documents submitted to authenticate the exhibits after this five day period. Any exhibit which Plaintiff fails to authenticate will be considered inadmissible and will not be considered by the Court in ruling on Defendant Lassen County's Motion for Summary Judgment. On the Court's own motion, the motion hearing on Defendant Lassen County's Motion for Summary Judgment (ECF No. 82) currently scheduled for July 11, 2013, is continued to August 22, 2013 at 2:00 p.m. in courtroom 7. (Deutsch, S) (Entered: 07/09/2013).

(ECF No. 134.) In response to the Court's minute order, Plaintiff submitted a Supplemental Affidavit to authenticate exhibits. (ECF No. 136.)

## BACKGROUND[5]

Michael Parker was arrested on July 4, 2009. (Dep. Nancy Schwarz, ECF No. 108-1 at 34.)

[5] The following facts are undisputed unless otherwise noted.

Parker's mother, Nancy Schwarz, posted his bail of $2,500 on that occasion. (Id. at 35.) He was released the same day. (Id.) Parker was again arrested on July 11, 2009, for violating the temporary restraining order prohibiting him from contacting his ex-girlfriend, Meredith Sides. (Id. at 26.) Schwarz again bailed Parker out. (Id.) On July 16, 2009, Parker was arrested for violating the protective order. (Decl. John Mineau, Ex. A, ECF No. 84-1 at 2; Dep. Schwarz, ECF No. 108-1 at 36.) His bail was set at $75,000. (Decl. Mineau, Ex. A, ECF No. 84-1 at 2.) On July 16, 2009, Parker filled out a "Lassen County ADF Questionnaire." (ECF No. 108-8 at 42.) This Questionnaire indicates that Parker takes medication prescribed by a doctor, has a heart condition, and is allergic to certain medications. (Id.) That same day, Parker filled out a "Receiving Screening Form." (ECF No. 108-8 at 43.) This form indicates that Parker took medication for heart disease, is allergic to certain medications, and has a "painful dental condition," next to which it is noted "wisdom teeth." (Id.)

Records from Banner Lassen Medical Center indicate that labs were ordered for Parker on July 18, 2009. (ECF No. 108-8 at 32.)

This form does not indicate that Parker was in pain. (Id.) Also on July 20, 2009, Parker and an officer filled out the Lassen County Adult Detention Facility Receiving Screening Form. (ECF No. 108-8 at 39.) The Form indicates that Parker is currently taking certain medications (Digitec, Tyzac and Cumidin) for a heart disorder. (Id.) The form also indicates that Parker recently saw a psychiatric doctor and is allergic to penicillin. (Id.) Parker also filled out a Lassen County ADF Questionnaire that day. (ECF No. 108-8 at 40.) This Questionnaire indicates that Parker suffers from a heart condition, takes medication prescribed by a doctor and is allergic to medications. (Id.) Also on July 20, 2009, Parker submitted a Health Care Services request stating "need meds put on cart." (ECF No. 108-8 at 38.)

On July 21, 2009, Nurse Practitioner John Anderson saw Parker. (Dep. John Anderson, Ex. C to Decl. Scott Cavanaugh, ECF No. 83-3 at 5.) Nurse Anderson works with Dr. Hal Meadows. (Dep. Anderson, Ex. C to Decl. Cavanaugh, ECF No. 83-3 at 3.)

Dr. Meadows has been the Lassen County Jail's contract physician since the mid-to-late 1980s. (Dep. Hal Meadows, Ex. D to Decl. Scott Cavanaugh, ECF No. 83-4 at 3.) Dr. Meadows had also been Parker's treating physician since Parker was about seven years old. (Dep. Schwarz, ECF No. 108-1 at 25.) Anderson's notes from the July 21, 2009, evaluation state: "37 year old male for an intake evaluation, taking Coumadin, Digitalis, and Naprosyn, has had INR done Saturday, has history of chronic back pain, had extra pillow, cardiovascular S1-S2." (Id.)

On July 23, 2009, while detained at the Facility, Parker submitted a Health Care Services Request to see a doctor because he believed he was being given his medications at the wrong time. (Decl. Mineau, Ex. B, ECF No. 84-1 at 4.) Anderson received this Request and reviewed it on July 26, 2009, and wrote his initial "J" in the lower right hand corner, and also wrote "No problem" on it, meaning he would fix this problem. (Dep. John Anderson, ECF No. 83-3 at 5.)

On July 24, 2009, Parker submitted a Health Care Services Request stating that he had experienced numbness in his left arm and feet for three to four days. (Decl. Mineau, Ex. C, ECF No. 84-1 at 6.) Anderson saw Parker "within 24 hours or so" of this complaint. (Dep. Anderson, Ex. C to Decl. Cavanaugh, ECF No. 83-3 at 6.) During that visit, Anderson note the following notes: "37 year old male here for chest pain and left arm pain, no distress, chest pain yesterday, no radiation, walked into office unaided, objective cardiovascular S1, S2, murmur heard . . . Respiratory CTA, equal grip, has full range of motion, feet were full range of motion, equal Blanch response, pedal pulse is equal, skin warm." (Id.) Anderson's assessment of Parker from that visit stated: "Left arm numbness transitory, feet numbness transitory." (Id. at 6-7.) Anderson also wrote a plan based on the assessment, which stated: "meds as ordered, return to clinic as needed." (Id. at 7.) Anderson also wrote a note on the form, stating "tell custody with chest pain, meaning whenever [Parker] got his chest pain, be sure to tell somebody." (Id.)

///

On August 2, 2009, Parker submitted a Health Care Services Request stating that he had experienced pain in the form of "lower stomach cramps" for three to four days. (Decl. Mineau, Ex. D., ECF No. 84-1 at 8.) On August 3, 2009, Parker against submitted a Health Care Services Request, which stated he had pain in his lower stomach. (Id. at 9.) Anderson saw Parker again on August 3, 2009. (Dep. Anderson, Ex. C to Decl. Cavanaugh, ECF No. 83-3 at 8.) Anderson's notes from that visit state: "37 year old male complains of lower abdomen cramping and pain for the last four to five days, denies diarrhea . . . Last BM this a.m., loose to normal, denies history of [Irritable Bowel]." (Id.) During that visit, Anderson listened to Parker's abdomen with a stethoscope. (Id.) Anderson noted "something about lower right quadrant, no rebound, lower abdomen with tenderness to palpitation." (Id. at 9.) Anderson palpated or pushed in the lower abdomen and Parker said it hurt. (Id.) Anderson's assessment was early gastritis, and Anderson made a plan for Parker to consume only clear liquids for twenty-four hours, and then to eat a diet of bananas, rice, applesauce, toast. (Id.) Parker was to return to the clinic in the morning for a follow up, "consider CBC, abdomen ultrasound." (Id.) Anderson also stated that Parker did not have a fever, which would have indicated a bacterial type of infection. (Id. at 10.)

Anderson saw Parker again on August 5, 2009. (Dep. Anderson, Ex C. to Decl. Cavanaugh, ECF No. 83-3 at 10.) This visit was not in response to a Health Care Services Request. (Id.) Anderson stated that during this visit, he observed that Parker "was still without fever, but the generalized tenderness in the abdomen was still there and [Anderson] thought [he] was feeling a mass . . . The bowel sounds were normal, but with a questionable mass, [Anderson] sent him up to the hospital for a special study, the CT of the abdomen." (Id.) This visit was the first time Anderson noted any potential mass in Parker's abdominal area. (Id.) On August 5, 2009, Anderson filled out and signed a Medical Department Information Chrono, containing the "medical recommendation" for "CT abdomen" and contains the note "abd. pain." (Medication Log, ECF No. 108-8 at 18.) The same form contains the note "8-6-09 @ 0930 DONE." (Id.)

On August 6, 2009, Parker was admitted to Banner Lassen Hospital, where he had a CT exam of his abdomen and pelvis with contrast. (Dep. Meadows (ECF No. 83-4 at 5).) The following day, Parker was transferred to Renown Hospital, where he had a drain placed to drain a pararectal abscess. (Defs.' Statement Undisputed Facts (ECF No. 82-2); Pl.'s Response to Defs.' Statement of Undisputed Facts (ECF NO. 108 at 5 ("Undisputed").) An inmate's visitation rights are suspended while the inmate is in the hospital. (Decl. Mineau, ECF No. 84 at 2.)

Around August 7, 2009, Schwarz's husband posted Parker's bail so Schwarz could visit Parker in the hospital. (Dep. Schwarz (ECF No. 83-2 at 6.) On August 13, 2009, Parker was released from Renown. On August 19, 2009, Parker's family physician, Dr. Meadows— also the contract doctor for the hospital—removed the drain tube at his office.

On September 1, 2009, Parker acquired a letter from a treating physician, Jasmine Dhindsa. (Ex. D to Dep. Jasmine Dhindsa, Ex. E to Decl. Cavanaugh, ECF No. 83-5 at 10.) The letter states, in relevant part:

> To Whom It May Concern:
>
> Mr. Parker is a patient at our facility. I see him for medical conditions that need to be treated and monitored closely. It is my understanding that he is to be incarcerated. This would be detrimental to his medical conditions. He has an intra-abdominal abscess, and a colonic fistula from the abscess to the sigmoid colon. He has been treated with a course of therapeutic antibiotics. He has also developed diverticulitis that requires a specific diet and care in order to prevent a flare up of this condition. It is not my intent to discourage any legal actions against Mr. Parker, but to give my medical opinion that incarceration would not be in his best medical interest. If an alternative of house arrest could be considered, I feel that would be the most beneficial to his medical well being.

(Id.)

On September 11, 2009, Dr. Meadows wrote a letter on Parker's behalf. (Ex. 5 to Dep. Meadows, Ex. D to Decl. Cavanaugh, ECF No. 83-4 at 16.) The letter states, in relevant part:

> Michael Parker has been my patient for several years. He recently was hospitalized in Reno with a pelvic abscess, which was treated surgically. After removing the drain, a repeat CT scan was performed, which demonstrates a persistent, enlarging recurrent abscess. It is quite likely that Michael is going to need another surgical procedure. If possible, his upcoming incarceration should be converted to a house arrest, because of the need for ongoing surgical care in Reno, coupled with hospitalization and numerous follow-ups.

(Id.) Dr. Meadows' intent in writing this letter was not to tell the jail staff "don't incarcerate this guy because, if you do, he's going to have serious health problems." (Dep. Meadows, Ex. D. to Decl. Cavanaugh, ECF No. 83-4 at 9.) Rather, the letter "was directed to either the jail commander or the sheriff or the judge, because . . . they're the ones, and primarily the judge, who make that decision. The judge, I think, makes the decision based on recommendations from the commander or the sheriff." (Id.)

On September 22, 2009, Parker was arrested at the Lassen Credit Union at 12:01 PM for violation of the restraining order. (Decl. Mineau, Ex. E, ECF No. 84-1 at 11.) Schwarz was present when Parker was arrested, and states that she told the officers that incarceration would kill her son.[6] (Aff. Schwarz, ECF No. 108-5 at 2.) Parker was then taken to the Facility.

Parker's bail was ultimately set at $150,000. (Decl. Mineau, Ex. E, ECF No. 84-1 at 11.) The Lassen County Adult Detention Facility Preebooking Sheet for Parker's September 22, 2009, arrest shows that his bail was initially set at $31,250, and was "raised per/crt"[7] to $150,000.00. (Decl. Mineau, Ex. E, ECF No. 84-1 at 11.)

When Parker was booked in the jail on September 22, 2009, Officer Russell filled out the "Receiving Screening Form," at 12:20. (Medication Log (Facility Records), ECF No. 108-8 at 14.) That form indicates that Parker was currently taking medication for heart disease and high blood pressure. (Id.) It also indicates that Parker had a special "low mass" diet prescribed by a physician. (Id.)

---

[6] This fact is disputed.

[7] The parties do not dispute that this notation means "raised per court."

It shows that Parker was recently hospitalized and contains the note "colon." (Id.) A second form, titled "Lassen County ADF Questionnaire," filled out on September 22, 2009, indicates that Parker had a heart condition, was allergic to medication, took medication prescribed by a doctor, but notes "N" next to the questions "Recently hospitalized?" and "Recently treated by a doctor?" (ECF No. 108-8 at 15.) A Medical Incident Report, also completed September 22, 2009, states "has a cist on colon, Dr. is going CAT scans every 2 weeks." (ECF No. 108-8 at 16.)

On September 22, 2009, Parker submitted a Health Care Services Request, stating "need to make apt for CT scan on abdomen." (ECF No. 108-8 at 17.) That form contains no indication that Parker was in pain. (Id.) On September 25, Parker was transported to Banner Lassen Hospital for a CT scan of his abdomen. On September 29, Parker submitted a medical form to "find out what the CT scan says." (Medication Log (Facility Records), ECF No. 108-8 at 13.) On September 29, Parker did not check the box on the form which indicates the patient is experiencing pain. (Id.)

According to Schwarz, on September 22, 2009, after Parker was arrested, Schwarz went home, retrieved Parker's medications and the letters from Drs. Dhindsa and Meadows. (Dep. Schwarz, ECF No. 108-1 at 126.) Schwarz estimates she got to the jail at 1:30 or 1:45. (Id.) The clerk from the jail told Schwarz that Parker had been booked and accepted Parker's medicine. (Id. at 127.)
Schwarz told the clerk that she did not need a receipt for the medication. (Id. at 128.)

According to Schwarz, when she visited Parker one week later, on September 30, 2009. (Dep. Schwarz, ECF No. 108-1 at 60.) According to Schwarz, Parker looked "very sick," "drawn," "like he had lost some weight," and was begging Schwarz to get him help. (Id.) Parker told Schwarz he was in a lot of pain. (Id.) Parker told Schwarz that he had put in several requests for medical care but had not seen a doctor. (Id.) That day, Schwarz talked to the clerk on duty as she left the jail, and asked the clerk to see if they could get somebody to get Parker medical help. (Id. at 61.)

///

Schwarz saw Parker again on October 7, when she says he had visibly lost over forty pounds and looked very ill.[8] (Dep. Schwarz, Ex. B to Decl. Cavanaugh, ECF No. 83-2 at 8.) When Schwarz asked Parker why he had not seen a doctor, he replied that the Facility staff had told him to quit complaining. (Id. at 9.)

On October 1, Parker submitted another form which said "CT scan." (Medication Log (Facility Records), ECF No. 108-8 at 12.) On that form, Nurse Anderson wrote "results ordered again." (Id.) There was again no indication on the form that Parker was in pain, as the box marked "pain" is not checked, and Parker did not indicate he experienced any other symptoms. (Id.)

On October 2, 2009, Parker submitted another form to "see CT scan says." (Medication Log (Facility Records), ECF No. 108-8 at 4.) Again, there was no indication on the form that Parker was in pain. (Id.) On October 4, Dr. Meadows saw Parker. (Dep. Meadows, Ex. D to Decl. Cavanaugh, ECF No. 83-4 at 11.) During that visit, Parker told Dr. Meadows he had no symptoms, which indicated that Parker was not in pain other than constipation, which Meadows discussed with Parker. (Id.) Dr. Meadows performed an abdominal exam on Parker and found nothing abnormal. (Id.) During the examination, Dr. Meadows performed a four-quadrant palpation and felt for masses. (Id. at 12.) Dr. Meadows fount that Parker's abdomen was soft, not tender, and Dr. Meadows could not detect any masses. (Id.) Dr. Meadows knew that Parker had a pelvic abscess, and planned to have another CT scan performed to double check that the abscess had resolved. (Id. at 13.)

On October 9, Parker submitted a medical form stating that he had stomach pain. (Medication Log (Facility Records), ECF No. 108-8 at 5.) That form contains the note "went to hospital." (Id.) On October 10, at 4:56 AM, Parker used the jail intercom to alert guards that he was experiencing abdominal pain. (Lassen County Sheriff Department Adult Detention Facility Informational Report, ECF No. 85-1 at 2.) Parker was almost immediately taken to Banner Lassen Hospital. (Id.)

[8] This fact is disputed. (See Dep. Meadows, ECF No. 83-4 at 14.)

At 5:09 AM, Correctional Supervisor Joan Schmidt left a message on the cell phone of Commander John Mineau to advise that Parker had been taken to the hospital. (Id.) After his arrival at Banner Lassen, Parker was transferred to the Renown Regional Medical Center, on October 10, 2009. (Ex. C to Dep. Iida, Ex. G to Decl. Cavanaugh, ECF No. 83-7 at 6.) Again, upon his arrival at Renown Regional Medical Center, Parker stated that his pain started the night before, he thought it would get better, but it continued so he was taken to the hospital. (Id.)

Thereafter, Parker did not contact Schwarz to set up a visit. (Dep. Schwarz, ECF No. 108-1 at 67.) Schwarz asked the clerks where her son was and why he had not set up an appointment. (Id.) Schwarz states that "nobody had any idea. Nobody knew nothing." (Id.) Schwarz then went to put money on Parker's books and noticed that Parker had close to $200 on his books already. (Id.) At this point, Schwarz felt she had to ask Undersheriff Mineau for information about her son. (Id. at 68.) Mineau was the instructor of a class which Schwarz was enrolled in. (Id.) At this class, Schwarz asked Mineau if she could speak with Mineau outside and asked Mineau about Parker. (Id.) Mineau informed Schwarz of Parker's hospitalization. (Id.) Mineau petitioned the DA and the Public Defender to allow Parker's release on his own recognizance. (Decl. Mineau, ECF No. 84 at 2.) Parker was released on his own recognizance on October 26, 2009. (Decl. Mineau, Ex. M, ECF No. 84-2 at 14.) Parker's release allowed Schwarz to visit Parker in the hospital before he died. (Decl. Mineau, ECF No. 84 at 2.)

On November 5, 2009, Parker died of gastronomical complications. (Washoe County District Health Department, Certificate of Death, ECF No. 108-12 at 1.)

///

///

///

///

///

///

## STANDARD

### A. Motion to Strike

The Court may strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "[T]he function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial . . . ." Sidney-Vinstein v. A.H. Robins Co., 697 F.2d 880, 885 (9th Cir. 1983). Immaterial matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded. Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1527 (9th Cir. 1993), rev'd on other grounds, 510 U.S. 517 (1994) (internal citations and quotations omitted). Impertinent matter consists of statements that do not pertain, and are not necessary, to the issues in question. Id.

### B. Motion for Summary Judgment

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex Corp., 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995).

///

The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

///

///

In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. 87.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

## ANALYSIS

### A. Plaintiff's Evidence in Support of Motion

As a preliminary matter, the Court must address the admissibility of certain documents that Plaintiff submitted in support of her Opposition to Defendants' Motion for Summary Judgment. For evidence to be admissible, it also must be shown to be authentic.

///

///

Federal Rule of Evidence 901(a) states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). "Authentication and identification represent a special aspect of relevancy . . . . This requirement of showing authenticity or identity falls into the category of relevancy dependent upon fulfillment of a condition of fact and is governed by the procedure set forth in Rule 104(b)." Fed. R. Evid. 901, Advisory Committee's Note.

Plaintiff originally failed to authenticate the documents that she submitted in support of her Opposition. (See ECF No. 108 at 25 ("Index of Exhibits").) The Court issued a minute order requiring Plaintiff to authenticate the exhibits submitted in support of her Opposition. (ECF No. 134.) Plaintiff then filed a Supplemental Affidavit to authenticate exhibits. (ECF No. 136.)

Plaintiff sufficiently authenticated the various depositions submitted in support of her motion. (ECF Nos. 108-1 (Dep. Nancy Schwarz), 108-2 (Dep. Tammy Langrehr), 108-3 (Dep. John Anderson), 108-6 (Dep. Dr. Jasmine Dhindsa), 108-9 (Dep. Dr. Calvin Iida).) Plaintiff has also adequately authenticated Banner Lassen Medical Center records (ECF No. 108-4), which Plaintiff's counsel states "were received by subpoena issued by opposing counsel and served upon the offices of Hager & Hearne" (ECF No. 136 at 3), and records from the Lassen County Sheriff's Department, Adult Detention Facility (ECF Nos. 108-8, 108-11), which Plaintiff states were produced by the County (ECF No. 136 at 3, 4). The affidavits of Nancy Schwarz (ECF No. 108-5) and Laura Lee (ECF No. 108-15) are also properly authenticated, as is the Certificate of Death (ECF No. 108-12) which was obtained by subpoena from Washoe County District Health Department. To the extent that there are still problems of authentication with these documents, the Court recognizes that Plaintiff is the non-movant in this summary judgment setting, and thus is "not attempting to prove its case, but instead seeks only to demonstrate that a question of fact remains for trial." Burch v. Regents of Univ. of Cal., 433 F. Supp. 2d 1110, 1121 (E.D. Cal. 2006).

"Recognizing the significance of this difference, the Ninth Circuit long ago adopted 'a general principle' whereby it 'treat[s] the opposing party's papers more indulgently than the moving party's papers.'" Id. (quoting Lew v. Kona Hosp., 754 F.2d 1420, 1423 (9th Cir. 1985)). Thus, while problems may remain with these documents, the Court finds that Plaintiff would be able to authenticate these documents at trial or provide this evidence in an admissible form. Accordingly, the Court may consider these exhibits in ruling on the Motion for Summary Judgment. (ECF No. 82.)

However, Plaintiff also submitted certain exhibits which Plaintiff still fails to authenticate, and which may not be authenticated at trial. First, Plaintiff submitted what Plaintiff contends is "the encyclopedia definition of 'sepsis.'" (ECF No. 108-7). Plaintiff asks that the Court take judicial notice of this definition, and states:

> [T]his definition was taken from a website of general access that defines medical terms. This definition was taken from the website to be used to define sepsis as a medical term. Stedman's Medical Dictionary . . . defines sepsis as 'the presence of various pathogenic organisms, or their toxins, in the blood or tissues.' The general definition from the website is more complete.

The "encyclopedia" that this definition was taken from is Wikipedia, and thus may not be considered as admissible evidence. See Bing Shun Li v. Holder, 400 F. App'x 854, 857 (5th Cir. 2010) ("We agree with those courts that have found Wikipedia to be an unreliable source of information."); Fleishman v. Cont'l Cas. Co., No. 09 C 00414, 2011 WL 5866264, at *4 (N.D. Ill. Nov. 22, 2011) ("As useful as Wikipedia is as an information source, a Wikipedia entry is not admissible evidence.").

Similarly, Plaintiff submitted as Exhibit 13 a "fact sheet on endocarditis," prepared by the Better Health Channel. (ECF No. 108-13; ECF No. 136 at 4.) The Court notes that

> It is now well recognized that '[a]nyone can put anything on the internet. No website is monitored for accuracy and nothing contained therein is under oath or even subject to independent verification absent underlying documentation . . . hackers can adulterate the content on any web-site from any location at any time. For these reasons, any evidence procured off the Internet is adequate for almost nothing . . . .

Internet Specialties W., Inc. v. ISPWest, CV 05-3296 FMC AJWX, 2006 WL 4568796, *1 (C.D. Cal. Sept. 19, 2006) (quoting Wady v. Provident Life and Accident Ins. Co. of Am., 216 F. Supp. 2d. 1060, 1064. (C.D. Cal. 2002)). To authenticate this document, Plaintiff must have someone with knowledge of the accuracy of the contents of the internet printouts testify. Id. at *2 (citing In re Homestore.com, Inc., Securities Litig., 347 F. Supp. 2d 769, 782 (C.D. Cal. 2004)). It is not enough to have "the person who went to the website and printed out the homepage" testify as to their authenticity. Id. at *1. Accordingly, this document is inadmissible and will not be considered by the Court.

Plaintiff also submits "a copy of the Core Jail Standards adopted by the American Correctional Association, recommended and used by 90% of jails and prisons in the United States even if not certified according to the website of this Association and is generally available to the public on the internet." (ECF No. 136 at 4 (citing to ECF No. 108-14).) For the same reasons that Exhibit 13 (Fact Sheet on Endocarditis) is inadmissible, this exhibit is also inadmissible and will not be considered by the Court.

Finally, Plaintiff fails to submit any authentication whatsoever for Exhibit 16, which is a definition of the medication Keflex, apparently taken from the website drugs.com. (ECF No. 108-16.) Even if Plaintiff had attempted to authenticate this document, Plaintiff would be unable to for the reasons set forth above. Accordingly, the Court will not consider this document in ruling on the Motion for Summary Judgment.

**B. Motion to Strike**

Defendants Lassen and Mineau moved to strike portions of Plaintiff's Statement of Disputed and Undisputed Facts. First, Lassen and Mineau contend that "where Plaintiff admits facts are undisputed, Plaintiff's addition of further facts should be struck as immaterial and/or impertinent." (ECF No. 117-1 at 2.) Plaintiff admits that Defendants' Undisputed Facts numbers 2, 6, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 22, 23, 25, 26, 27, 28, 29, 34, 38, 40, 50, 56, 61, 62, 63 and 81 are undisputed.

However, Plaintiff then goes on to state that these facts are "incomplete," and Plaintiff's response to these facts each add additional facts. Defendants contend that these responses by Plaintiff fail to comply with Eastern District of California Local Rule 260(b), which provides that the party opposing a summary judgment must dispute the moving party's statement of undisputed facts, and that the opposing party may also file a statement of disputed facts. Plaintiff attempts to combine the two, by both responding to Defendants' Statement of Undisputed Facts and adding in her own facts. Defendants thus contend that the Court "should strike the language following Plaintiff's admission that the facts are undisputed . . . ." (ECF No. 117-1 at 2.)

Defendants also request that the Court strike "all of Plaintiff's facts unsupported by evidence." (ECF No. 117-1 at 3.) Plaintiff purports to dispute Defendants' Undisputed Facts 4, 5 and 7, but fails to provide a citation to evidence which puts these "undisputed facts" into dispute. (ECF No. 108 at 2, 3.) For example, Undisputed Fact 4 states: "Plaintiff Nancy Schwarz, Parker's mother, testified that 'he spent a lot of his adult life in County Jail. I don't deny that.'" (ECF No. 82-2 at 2.) In support of this undisputed fact, Defendants cite to the Deposition of Nancy Schwarz. (Id.) By way of response, Plaintiff states: "Disputed. What is the definition of a lot." (ECF No. 108 at 2.) To the extent that this response is coherent, it fails to provide a citation to evidence which puts Defendants' statement of undisputed fact into actual dispute.

Plaintiff contends that "Plaintiff . . . has the right to point out the insufficiency of the stated facts in any manner that demonstrates that the Defendant lacks the facts or law supporting the allegations by the Defendant in support of the Motion for Summary Judgment." (ECF No. 124 at 2.) Plaintiff apparently fails to understand the Local Rules are binding on the parties and govern cases within this District.

///

///

///

///

Local Rule 260(b) requires that "[a]ny party opposing a motion for summary judgment or summary adjudication shall reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relief upon in support of that denial." L.R. 260(b) (emphasis added).

> Requiring strict compliance with [the local rule governing summary judgment motions] is justified both by the nature of summary judgment and by the rule's purposes. The moving party's statement [of undisputed facts] specifies the material facts and directs the district judge and the opponent of summary judgment to the parts of the record [that] the movant believes support his statement. The opponent then has the opportunity to respond by filing [a statement of disputed facts] and affidavits showing genuine factual issues. The procedure contemplated by the rule thus isolates the facts that the parties assert are material, distinguishes disputed from undisputed facts, and identifies the pertinent parts of the record.

United States v. Burrell, 2:11-CV-03079-GEB, 2013 WL 1858424 (E.D. Cal. May 2, 2013) (quoting Gardels v. Cent. Intelligence Agency, 637 F.3d 770, 773 (D.C. Cir.1980)).

However, while Plaintiff's responses are to Undisputed Facts 4, 5 and 7 are non-responsive, they are not "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Thus, the Court declines to strike Plaintiff's response. However, the Court finds that Plaintiff has failed to show that these facts are disputed, as Plaintiff's responses are unsupported by evidence and therefore are not considered by the Court.

Defendants also request that the Court sustain Defendants' objections to the evidence submitted by Plaintiff to dispute Defendants' Undisputed Facts. Defendant objects to Plaintiff's response to Defendants' Undisputed Fact 44, 45, 46, 47, 58 and 78.[9] Rather than strike these responses, as they are not "redundant, immaterial, impertinent, or scandalous matter," Fed. R. Civ. P. 12(f), the Court simply declines to consider any statements of fact not supported by the admissible evidence before the Court.

[9] Defendants also object to Plaintiff's response to Undisputed Facts 4, 5 and 7. However, the Court disregards these responses for failure to comply with local rules, and thus the Court need not consider Defendants' other objections to these responses.

Thus, as set forth above, Plaintiff's responses which rely on information obtained from websites, or other inadmissible evidence, will not be considered by the Court, as such evidence is inadmissible.

Defendants also object to Plaintiff's responses which rely on the affidavit of Cesar Lucatero, as well as object to the affidavit itself, because Lucatero was never provided as a potential witness in Plaintiff's initial Rule 26 disclosures or Plaintiff's four supplemental disclosures. (ECF No. 117-1 at 8.) Defendants attach Plaintiff's Rule 26 initial disclosures, as well as Plaintiff's four supplemental disclosures, to Defendants Motion to Strike. (ECF No. 117-3.) None of these disclosures contain Mr. Lucatero's name. Plaintiff responds that "[t]he affidavit of Cesar Lucatero was disclosed within the discovery period," (ECF No. 124 at 7) yet provides no evidence to refute the evidence submitted by Defendants. Rule 37(c)(1) states, "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Here, Plaintiff fails to show that Mr. Lucatero was identified as a witness as required by Rule 26, and also fails to show that this failure was substantially justified or is harmless. Thus, the affidavit of Mr. Lucatero is inadmissible as evidence, and any response by Plaintiff to an Undisputed Fact which purports to rely on Mr. Lucatero's affidavit is disregarded.

Additionally, Defendants take issue with various responses by Plaintiff which, according to Defendants, misstate the evidence, are irrelevant, and are vague and ambiguous. (ECF No. 117-1 at 12.) Such objections "are all duplicative of the summary judgment standard itself . . . . A court can award summary judgment only when there is no genuine dispute of material fact. It cannot rely on irrelevant facts, and thus relevance objections are redundant." Burch v. Regents of Univ. of Cal., 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006). Moreover, "[a]s a practical matter, . . . this entire exercise of considering evidentiary objections on a motion for summary judgment [is] futile and counter-productive. . . .

[T]his procedure begins to defeat the objectives of modern summary judgment practice—namely, promoting judicial efficiency and avoiding costly litigation." Id. at 1122. Defendants appear to have lost sight of the fact that the Court is not bound to accept either party's statement of the facts—these are statements of facts, and not the facts or evidence themselves. The statements of disputed and undisputed facts are intended to, and hopefully do, assist the Court in deciding the motion for summary judgment. However, the Court necessarily must review and carefully consider the evidence before it to determine the relevant facts, and whether those facts are disputed or undisputed based on the factual record before it. Accordingly, Defendants' remaining evidentiary objections to Plaintiff's Responses and Plaintiff's Additional Material Facts are denied as moot.

Finally, Defendants contend that the Court should overrule Plaintiff's objection to Defendant's Statement of Undisputed Fact No. 54. (ECF No. 117-1 at 15.) Defendant's Fact 54 states: "Parker's intake form at Banner Lassen Hospital reports that Parker's 'pain started about 1930 tonight. Finally told CO's about 10 minutes ago so now here.'" (ECF No. 82-2 at 11 (citing Ex. F, Banner Lassen Medical Records).) Plaintiff's Response states: "Disputed. The hospital record reporting what was said to the doctor at intake is hearsay. A mistake was made in an earlier record where it stated that the inmate had seen Dr. Meadows when, in fact, he had not." (ECF No. 108 at 16.) Neither party appears to notice that the records from Banner Lassen Hospital were not actually submitted as Exhibit F to the Declaration of Scott Cavanaugh. Rather, records from Renown Regional Medical Center were submitted as Exhibit F to the Declaration of Scott Cavanaugh (although Cavanaugh's Declaration states that Exhibit F is a true and correct copy of excerpts from Michael Parker's medical records from Banner Lassen Hospital). Accordingly, Plaintiff's objection is denied as moot.

///

///

///

**C. Section 1983 Claims Against Lassen County**

Plaintiff's claim against Susanville arises under 42 U.S.C. § 1983, which provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." Plaintiff claims Susanville's practices and policies, or lack thereof, violated Plaintiff's constitutional rights.

Plaintiff's claims against Lassen are based on Monell v. Department of Social Services, which held "municipalities were 'persons" under § 1983 and thus could be held liable for causing a constitutional deprivation." Fairley v. Luman, 281 F.3d 913, 916 (9th Cir. 2002) (citing Monell v. Dep't of Social Servs., 436 U.S. 658, 690 (1978)). "While local governments may be sued under § 1983, they cannot be held vicariously liable for their employees' constitutional violations." Gravelet-Blondin v. Shelton, 12-35121, 2013 WL 4767182, *7 (9th Cir. Sept. 6, 2013) (quoting Monell, 436 U.S. at 690, 694). Instead, a municipality is subject to suit under § 1983 only "if it is alleged to have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" Id. (quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 121 (1988)). Alternatively, liability may be based on a policy, practice or custom of omission amounting to deliberate indifference." See Gibson v. City of Washoe, Nevada, 290 F.3d 1175 (9th Cir.2002).

Thus, a plaintiff may state a civil rights claim against a municipality under § 1983 by showing she has suffered a deprivation of a constitutionally protected interest, and that the government "had a deliberate policy, custom, or practice that was the 'moving force' behind the constitutional violation . . . ." Galen v. County of Los Angeles, 477 Fl.3d 652, 667 (9th Cir. 2007) (quoting Monell, 436 U.S. at 694-95); Cornejo v. County of San Diego, 504 F.3d 853, 855 n.4 (9th Cir. 2007).

"To meet this requirement, the plaintiff must show both causation-in-fact and proximate causation." Gravelet-Blondin, 2013 WL 4767182 at *7 (citing Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008)).

Monell therefore requires Plaintiff prove: (1) she "was deprived of a constitutional right"; (2) the municipality "had a policy"; (3) "the policy amounted to deliberate indifference to her constitutional rights; and (4) the policy was the moving force behind the constitutional violation." Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs., 237 F.3d 1101, 1110-11 (9th Cir. 2001).

There are three ways to show an affirmative policy or practice of a municipality: (1) by showing "a longstanding practice or custom which constitutes the "standard operating procedure" of the local government entity"; (2) "by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision"; or (3) "by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." Menotti v. City of Seattle, 409 F.3d 1113, 1147 (9th Cir. 2005) (quoting Ulrich v. City and County of San Francisco, 308 F.3d 968, 984 (9th Cir. 2002)). To establish a policy of omission, Plaintiffs must show that "the municipality's deliberate indifference led to its omission and that the omission caused the employee to commit the constitutional violation." Gibson v. City of Washoe, 290 F.3d 1175, 1186 (9th Cir. 2002). Plaintiffs can establish deliberate indifference only by showing that "the municipality was on actual or constructive notice that its omissions would likely result in a constitutional violation." Id. An "improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method for carrying out policy." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir.1996).

Plaintiff's Opposition argues at length that the jail facility staff was deliberately indifferent to Parker's serious medical needs.

///

Even assuming that the jail staff was deliberately indifferent to Parker's serious medical needs, Parker must show that there was "an official policy, practice, or custom" employed by Lassen which caused the constitutional violation which Parker suffered.

Plaintiff's Opposition to Defendant's Motion for Summary Judgment puts forward multiple "policies" which Plaintiff contends caused the constitutional violation Parker allegedly suffered. First, Plaintiff states that "[a] Correctional Officer without medical training screened Michael Parker, the jail was on notice of his serious health condition and did nothing to seek a medical evaluation, assure that his medications were administered, or determine his condition when he entered the jail." (Id. at 14.) On a similar note, Plaintiff asserts that the Facility "had no check on medical condition of the inmates at booking except by a non-medically trained correctional officer . . . ." (Id. at 17.) First, the Court notes that some of these contentions are specific to Parker—these contentions do not specifically state that there is an overarching policy of failing to adequately screen incoming arrestees for medical conditions, seek medical evaluations for inmates, assure that medications are properly administered, or determine arrestees' conditions when the arrestees enter jail. Nonetheless, for the sake of thorough analysis, Plaintiff's contention that the Facility "had no check on medical condition of the inmates at booking except by a non-medically trained correctional officer . . ." (id. at 17) will be addressed as a "policy."

Plaintiff provides evidence from Tammy Langrehr, a supervisor at the Facility, stating that "from the time the deputy or the police officer brings [an arrestee] into the sally port," the officers at the Facility "go out to the sally port, get the inmate out of the car, ask them questions pertaining if they have any drugs, weapons, any conditions we need to know about, walk them into the jail, pat them down while they are still handcuffed, . . . have them have a seat, and we start going through property, medical questions, . . . log all that." (ECF No. 108-2 at 11-12.) Lengrehr went on to clarify that arrestees are asked, in the sally port, about "any medical conditions" the arrestee has, "anything we need to know about." (Id. at 12.)

If an arrestee tells the officer that they have a medical condition, Lengrehr stated, "I ask them to elaborate on their medical condition, if they take any medications, what kind of medications do they take, and if they have taken them or when they take them." (Id.) When asked "[w]hat is the policy of the [Facility] if there is a condition that you believe requires a medical check?" Lengrehr responded: "If it's an emergent condition that requires a medical check the deputy or police officer needs to take them up to the hospital if it's an emergency situation. If not an emergent situation, we document on the medical form what medical conditions they have and then they see Dr. Meadows or our PA John Anderson in the morning on sick call." (Id. at 12-13.) An "emergency situation" would be "if there is physical sign of injury, any major type of injury that the jail cannot accommodate, if they say they are having chest pains, any major problems." (Id. at 13.) The direct to make that decision comes from "[the Facility's] medical form." (Id.)

Lengrehr also testified in her deposition about the Facility's "handwritten medical screening form." (ECF No. 108-2 at 25.) Lengrehr testified that the officer asks the inmate the questions on the form. (Id.) If an inmate needed a particular diet, it would be filled out on the screening form "at the time of booking . . . ." (Id. at 27.) Then, when the inmate "go[es] to see the doctor, the doctor would look at this and write a chrono for a special diet. That chrono then goes to the kitchen and we get a copy as well so we know that the inmate has a special diet." (Id.) Similarly, the form is marked by the officer, based on answers from the inmate, whether the inmate takes medication prescribed by a doctor. (Id. at 28.) "The inmate will then in turn on sick call see the doctor and discuss this with the doctor. We don't—we don't prescribe medication. They have to see the doctor. The doctor then asks them their medications . . . ." (Id.) The intake form is given to the doctor who will see the inmate. (Id. at 28-29.) While "the booking clerk does not have a responsibility of making sure that the [inmate] [is] seen by the doctor," the forms "go into . . . the medical box in intake." (Id. at 29.) However, Lengrehr could not answer whether there is a "direction and policy" for everyone in the supervisor position to put the inmate on the sick call list. (Id. at 30.)

Thus, to the extent Plaintiff contends there was a custom or policy of failing to properly screen individuals for medical issues, their medications, and whether the individual is experiencing an emergency medical condition, Plaintiff not only fails to provide evidence of this failure, Plaintiff offers evidence establishing that there is a policy for such screening. To the extent that Plaintiff contends there was a failure to train Facility employees about how to deal with medical conditions of incoming arrestees, Plaintiff provides absolutely no evidence to support this contention. Moreover, Plaintiff provides no evidence that it is constitutionally required that a medically trained employee screen every incoming inmate, and the Court does not find that such a screening is constitutionally mandated.

Plaintiff also contends that "a reasonable jury could conclude that the failure to establish a policy to address the immediate medication needs of inmates with serious medical conditions creates a risk that is sufficiently obvious as to constitute deliberate indifference to those inmates' medical needs." (Id. (citing Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575 (3d Cir. 2003)). However, Plaintiff provides no evidence to support her contention that there is a failure to establish a policy to address the immediate medication needs of inmates—the immediate medication needs of inmates are not at issue in this case, as there is no evidence Parker needed immediate medication. This case is not one in which a diabetic arrestee immediately needed insulin, as Plaintiff seems to contend. (See ECF No. 107 at 16 (citing Natale v. Camden County Corr. Facility, 318 F.3d 575 (3d Cir. 2003).) Thus, while there may be a failure to establish a policy to address the immediate medication needs of inmates,[10] there is not a scintilla of evidence causally linking this policy to Parker's constitutional injury.

Plaintiff next contends that the Facility "had no protocol for determining if the bail for pretrial detainees was accurate." (ECF No. 107 at 17.)

///

[10] The Court does not determine that such a policy is lacking, but rather assumes for the sake of analysis that it is.

Again, this contention is irrelevant to this case, as Plaintiff has put forward no evidence that the bail amount was inaccurate in Parker's case. Thus, to the extent that Lassen is constitutionally required to establish a protocol for Facility employees to determine if the bail for pretrial detainees is accurate, the lack of such a protocol has no causal connection to the constitutional violation which Parker allegedly suffered.

Finally, Plaintiff asserts that "the [Facility] should have medical personnel on site available to treat and identify critical illness." (ECF No. 107 at 19.) This final assertion borders on the absurd, as it is undisputed that Dr. Meadows and Nurse Anderson were available to treat and identify illnesses, including Parker's.

In sum, Lassen is entitled to summary judgment on each of Plaintiff's § 1983 claims against the County, as Plaintiff has presented no evidence to create a genuine issue of material fact regarding a policy or practice, or lack thereof, that was the moving force of the alleged constitutional violations.

Accordingly, Lassen's motion for summary judgment is granted as to Plaintiff's federal claims.

**D. Section 1983 Claims Against John Mineau**

As set forth above, § 1983 "creates a cause of action against a person who, acting under color of state law, deprives another of rights guaranteed under the Constitution." Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002). Section 1983 does not create any substantive rights; rather, it is the vehicle whereby plaintiffs can challenge actions by governmental officials. "To prove a case under § 1983, the plaintiff must demonstrate that (1) the action occurred 'under color of state law' and (2) the action resulted in the deprivation of a constitutional right or federal statutory right." Id. (quoting Parratt v. Taylor, 451 U.S. 527, 535 (1981), overruled on other grounds by Daniels v. Williams, 474 U.S. 327 (1986)).

///

The Ninth Circuit "ha[s] long permitted plaintiffs to hold supervisors individually liable in § 1983 suits when culpable action, or inaction, is directly attributed to them." Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011). Government officials acting as supervisors may be liable under § 1983 under certain circumstances. "[W]hen a supervisor is found liable based on deliberate indifference, the supervisor is being held liable for his or her own culpable action or inaction, not held vicariously liable for the culpable action or inaction of his or her subordinate." Id. A defendant may be held liable as a supervisor under § 1983 if there exists "either (1) his or her personal involvement in the constitutional deprivation; or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989); Starr, 652 F.3d at 1207.

A supervisor's physical presence is not required for supervisory liability. Starr, 652 F.3d at 1205. Rather, the requisite causal connection between a supervisor's wrongful conduct and the violation of the prisoner's Constitutional rights can be established in a number of ways. The plaintiff may show that the supervisor set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury. Dubner v. City & County of San Francisco, 266 F.3d 959, 968 (9th Cir. 2001); Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991). Similarly, a supervisor's own culpable action or inaction in the training, supervision, or control of his subordinates may establish supervisory liability. Starr, 652 F.3d at 1208; Larez, 946 F.2d at 646. Finally, a supervisor's acquiescence in the alleged constitutional deprivation, or conduct showing deliberate indifference toward the possibility that deficient performance of the task may violate the rights of others, may establish the requisite causal connection. Starr, 652 F.3d at 1208; Menotti v. City of Seattle, 409 F.3d 1113, 1149 (9th Cir. 2005).

///

///

Thus, to refute Mineau's Motion for Summary Judgment on Plaintiff's claims for cruel and unusual punishment in violation of the Fourteenth Amendment, deprivation of the basic necessities of life, failure to provide medical care for a serious medical condition, and deprivation of life without due process,[11] Plaintiff must show that there are genuine issues of material fact as to whether Parker has a "serious medical need," and that Mineau was "deliberately indifferent" to that need.

Plaintiff's Opposition contends that "it was only when John Mineau realized that he had so neglected Michael Parker's health at the [Facility] that Michael Parker was going to die, that Mineau informed Michael's mother that he was hospitalized." (ECF No. 107 at 6.) Plaintiff presents absolutely no evidence to support this contention. Plaintiff also stated that:

> Just as John Mineau was able to ask the Court to release Michael Parker so his family could see him before he died, John Mineau had the authority and duty to ask the Court for house arrest for Michael Parker because he was too sick to be in jail. John Mineau and Lassen County violated Michael Parker's constitutional rights by placing him in jail when they were on notice that he was too sick to be in jail. John Mineau and the jail failed to call either doctor to clarify the terms of the medical danger so any statements by the doctors after the fact are gratuitous . . . .

(ECF No. 107 at 17.)

However, Plaintiff submits no evidence, or legal authority, for the proposition that Mineau had a duty to ask the Court for house arrest for Michael Parker. Plaintiff points to no law or evidence establishing that Michael Parker had a right to be on house arrest. The letters which Plaintiff contends establish this fact simply do not require house arrest, as Plaintiff contends they do.

///

///

///

[11] As stated above, the Court treats this claim as an Eighth Amendment claim rather than a claim for a Substantive Due Process violation.

In short, as to Plaintiff's claims against Mineau for cruel and unusual punishment, deprivation of the basic necessities of life, deprivation of life without due process of law, failure to provide medical care for a serious medical condition, Plaintiff has provided the Court with absolutely no evidence creating a genuine issue of material fact as to whether there is "culpable action, or inaction," directly attributed to Mineau. Starr, 652 F.3d at 1207. Accordingly, Plaintiff has failed to meet her burden in opposing Mineau's motion for summary judgment on these claims.

Finally, in what appears to be argument related to Plaintiff's claims against Mineau for violation of her right to familial association, Plaintiff alleges that "John Mineau deprived the Plaintiff of the knowledge that her son was hospitalized in critical condition for two weeks[,] which was one half of the rest of his life." According to Plaintiff:

> On October 10, 2009, Michael Parker was again rushed to Renown Hospital in Reno, Nevada. Nancy Schwarz contacted the jail to see her son and was told that he was not available. When Nancy Schwarz confronted John Mineau two weeks later at a class he was teaching about where her son was and why she couldn't see him, he finally admitted that Michael Parker was in critical condition in Renown.

(Id. at 19.) Plaintiff provides absolutely no argument, or even citation to case law, suggesting how Mineau's failure to relay this information to Plaintiff constitutes a violation of Plaintiff's First and Fourteenth Amendment rights.

Parents of a decedent have a constitutionally protected liberty interest in their familial relationship under the Fourteenth Amendment. Curnow By and Through Curnow v. Ridgecrest Police, 952 F.2d 321, 325 (9th Cir. 1991). "It is well established that a parent has a fundamental liberty interest in the companionship and society of his or her child and that the state's interference with that liberty interest without due process of law is remediable under 42 U.S.C. § 1983." Lee v. City of Los Angeles., 250 F.3d 668, 685 (9th Cir. 2001) (internal citations, quotations, and alterations omitted).

///

///

///

The standard for such a violation is based on substantive due process, see Moreland v. Las Vegas Metro. Police Dep't, 159 F.3d 365, 371 (9th Cir. 1998), as the Fourteenth Amendment "provides heightened protection against government interference with certain fundamental rights and liberty interests," Washington v. Glucksberg, 521 U.S. 702, 721 (1997).

"The concept of 'substantive due process,' . . . forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty.'" Nunez v. City of Los Angeles, 147 F.3d 867, 871 (9th Cir. 1998) (quoting United States v. Salerno, 481 U.S. 739, 746 (1987)). "The substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" Arres v. City of Fresno, CV F 10-1628 LJO SMS, 2011 WL 284971, at *14 (E.D. Cal. Jan. 26, 2011) (quoting Collins v. City of Harker Heights, 503 U.S. 115, 128 (1992)).

Thus, "[t]o prevail on a Fourteenth Amendment claim arising out of the loss of a familial relationship, a plaintiff must show that the Defendant's conduct shocks the conscience." Provencio v. Vazquez, 258 F.R.D. 626, 640 (E.D. Cal. 2009) (citing Moreland, 159 F.3d at 372); see also Arres, 2011 WL 284971, at *15 ("Conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to conscience-shocking level."); Kim v. City of Santa Clara, No. C 09-00025 RS, 2010 WL 2034774, *6 (N.D. Cal. May 19, 2010). "What state of mind shocks the conscience depends on the circumstances of a particular case." Id. Whether conduct "shocks the conscience" may be decided by the court on a motion for summary judgment. Kim, 2010 WL 2034774, at *7.

As the Court's order granting Defendant Susanville's Motion for Summary Judgment explained, a claim for violation of the First Amendment right to familial association must identify a policy which interferes with core associational liberties.

///

See Lee v. City of Los Angeles, 250 F.3d 668, 685 (9th Cir. 2001); Zablocki v. Redhail, 434 U.S. 374, 388 (1978).

Here, Plaintiff does not even argue that Mineau's conduct shocks the conscience, much less cite to specific evidence showing conduct that shocks the conscience. Similarly, Plaintiff fails to provide evidence of, or even reference to, a policy which interfered with Plaintiff's core associational liberties. As the Court's previous order stated, "judges are not like pigs, hunting for truffles buried in briefs." Guatay Christian Fellowship v. County of San Diego, 670 F.3d 957, 987 (9th Cir. 2011). Plaintiff has failed to provide any evidence at all which would allow the Court to find that there is a genuine issue of material fact warranting denial of Mineau's motion for summary judgment as to these claims.

Accordingly, Mineau's motion for summary judgment is granted as to Plaintiff's federal claims.

**E. State Law Claims**

Pursuant to 28 U.S.C. § 1367(c)(3), if a federal district court has dismissed all claims over which it has original jurisdiction, it may, in its discretion, dismiss without prejudice supplemental state law claims brought in the same action. 28 U.S.C. § 1367(c)(3); see Acri v. Varian Assocs., Inc., 114 F.3d 999, 1001 (9th Cir. 1997) (en banc). Several factors are considered in determining whether the Court should exercise jurisdiction over the state law claims. These factors include economy, convenience, fairness, and comity in deciding whether to retain jurisdiction over pendent state claims. Imagineering, Inc. v. Kiewit Pac. Co., 976 F.2d 1303, 1309 (9th Cir. 1992) (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 353 (1988)). Although the court is not required to dismiss the supplemental state law claims, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."

Carnegie–Mellon Univ., 484 U.S. at 350 n.7; see also Schneider v. TRW, Inc., 938 F.2d 986, 993-94 (9th Cir. 1991).

Here, the Carnegie-Mellon factors weigh in favor of remand. Only state law claims remain, and the case has yet to proceed to trial. Judicial economy does not favor continuing to exercise supplemental jurisdiction. Nor do the comity and fairness factors weigh in favor of exercising supplemental jurisdiction since "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966). Plaintiff's state law claims are therefore dismissed without prejudice under 28 U.S.C. § 1367(c).

**CONCLUSION**

For the reasons set forth above, IT IS HEREBY ORDERED THAT:

1. Defendants' Motion to Strike (ECF No. 117) is GRANTED IN PART and DENIED IN PART;
2. Defendants' Motion for Summary Judgment (ECF No. 82) is GRANTED as to Plaintiff's federal claims;
3. Plaintiff's state law claims are DISMISSED WITHOUT PREJUDICE for lack of jurisdiction;
4. The Clerk of the Court is directed to close the case.

IT IS SO ORDERED.

Dated: September 27, 2013

MORRISON C. ENGLAND, JR, CHIEF JUDGE
UNITED STATES DISTRICT COURT